# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DAVID GALLOWAY, JENNY GALLOWAY, and DAVID GALLOWAY as Administrator of the Estate of CHRISTI GALLOWAY, Deceased, | |
| Plaintiffs, | No. 11 C 01583 |
| v. | |
| | Judge Edmond E. Chang |
| RAND PHARMACY, INC., f/k/a, ROOTS PHARMACY SOLUTIONS, INC.; KYLE ROOTSAERT; BETA PROPERTY ENTERPRISES, INC., d/b/a KRESGE-LEBAR PHARMACY; RUDY BYRON; ELIAS KARKALAS; UPPER MERION FAMILY PRACTICE, P.C.; and EUROMEDONLINE LIMITED, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This case arises out of the tragic death of a Georgia woman, Christi Galloway, from an overdose of prescription medication in May 2009. After her death, Galloway's estate and parents sued the online prescription drug service, pharmacies, pharmacists, and doctors through which she obtained the allegedly fatal medication, Carisoprodol.[1] Defendants now move for summary judgment on the remaining claims in the action, which allege professional malpractice in violation of Georgia law. For the reasons explained below, that motion is denied except as to Defendant Kyle Rootsaert, for whom the motion is granted.

---

[1] The Court exercises subject-matter jurisdiction based on the complete diversity of the parties and the amount in controversy, under 28 U.S.C. § 1332.

## I. Background

### A. Relevant Facts

Christi Galloway died on May 18, 2009, at the age of 30. R. 193, DSOF ¶ 22; R. 5, Am. Compl. Count 1 ¶ 9.[2] The cause of death, according to the Cobb County Medical examiner was multiple drug toxicity. DSOF ¶ 23. Galloway's autopsy revealed several substances in her blood: Hydrocodone, Alprazolam, Meprobamate, and Carisoprodol. *Id.* ¶ 24. The crucial issue in this negligence action is the role of the last of these medications—and how she obtained and used it—in Galloway's death.

In order to obtain the Carisoprodol, which is also known by its trade name, Soma, Galloway had completed a questionnaire on a website operated by Defendant Euromedonline Limited, a marketing and referral service providing online ordering for prescription drugs. *Id.* ¶ 13; Am. Compl. Count 3 ¶ 2. On the basis of Galloway's online questionnaire, she received three separate prescriptions for, and shipments of, Carisoprodol. DSOF ¶¶ 12-13. Two of these originated with Defendant Beta

---

[2]Citations to the docket are noted as "R" followed by the entry number. DSOF refers to the Local Rule 56.1 Statements of Fact submitted by Defendants Elias Karkalas, M.D., and Upper Merion Family Practice, P.C., which was adopted by the remaining Defendants. *See* R. 197, Roostaert's Br. at 8; R. 200, Byron's Br. at 2. Where the opinion cites only to the DSOF, as opposed to the Plaintiffs' Statements of Additional Fact (PSOF) as well, the relevant facts are undisputed. Citations to paragraph numbers in the PSOF refer not to Plaintiffs' responses to Defendants' initial facts, but to Plaintiff's additional facts. Defendants filed a reply with responses to the additional facts raised in the PSOF (DSOF Reply). Rootsaert submitted his own supplemental statement of facts (Rootsaert SOF).

The Court also occasionally cites to the Amended Complaint as the source of background facts that the parties' Rule 56.1 Statements have omitted (for example, Galloway's age at her death and the location of the various Defendant businesses). To the extent that these details represent material facts, as with all other facts for the purposes of this motion, the Court views them in the light most favorable to Plaintiffs as the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

Property Enterprises, a pharmacy located in Stroudsburg, Pennsylvania. *Id.* ¶ 14; Am. Compl. Count 4 ¶ 1. Beta Property sent two 150-tablet shipments, 350 milligrams per tablet, to Galloway, one on March 3 and the other on April 6, 2009. DSOF ¶¶ 15-16. These shipments were made to fill prescriptions authorized by Defendants Elias Karkalas, M.D., and Upper Merion Family Practice, P.C. DSOF ¶ 14; Am. Compl. Count 4 ¶ 2. The third shipment was sent to Galloway by Defendant Rand Pharmacy (which is owned by Defendant Kyle Rootsaert), which operated a pharmacy facility in Des Plaines, Illinois. DSOF ¶ 17; Am. Compl. Count 1 ¶ 1**.** This shipment was sent on April 24, 2009, and consisted of 90 350-mg Carisoprodol tablets. DSOF ¶ 18. The prescription for that order was authorized by Defendant Rudy Byron, M.D.*Id.*. Neither Karkalas nor Byron examined Galloway in person before issuing their prescriptions. R. 203, PSOF ¶ 2.

In addition to these orders linked to Defendants, Galloway was prescribed Carisoprodol three other times in the six weeks or so before her death. Specifically, on April 14, 2009, Dr. Atauallah Arain issued her a prescription for 90 350-mg tablets. DSOF ¶ 19. On April 2 and May 13, 2009, Dr. Anthony Cabot authorized prescriptions for 30 tablets as well, to be taken once a day; the dosage of each of these particular tablets is not specified by the parties nor reflected in the record. *Id.* ¶¶ 20-21.

Galloway's body was discovered in the kitchen of her Atlanta apartment on May 18. R. 202-6, Medical Examiner's Report at 1. In the living room and kitchen, investigators found numerous empty prescription bottles for a range of muscle

3

relaxants, pain medications, and anti-anxiety medications. *Id*. There were 18 medication bottles on the kitchen counter, including three empty bottles of Carisoprodol. *Id*. at 2; DSOF ¶ 26. Two Carisoprodol bottles were linked to Karkalas/Upper Merion and Beta Property, and the other bottle was linked to one of Cabot's prescriptions. *Id*. Two more prescription bottles were found in a living-room drawer, one of which was for Carisoprodola an was issued May 13 (which was the second of Cabot's prescriptions), and had 19 of 30 pills remaining. Medical Examiner's Report at 2; DSOF ¶ 26. A final Carisoprodol bottle, issued by Dr. Byron and Rand, was later found by Galloway's father as he was cleaning out the apartment ten days after her death; that bottle too was empty (it is not clear where in the apartment the bottle was found). DSOF ¶ 28; R. 202-15; David Galloway Aff. ¶¶ 1-3.

The medical examiner did not give an opinion about whether Carisoprodol contributed to Galloway's death, DSOF ¶ 25, and the parties contest this question.Def.'s Resp. PSOF ¶ 6. They also dispute which of the various prescriptions was the source of the Carisoprodol found in Galloway's body at the time of her death. *See* DSOF ¶ 36; Def.'s Resp. PSOF ¶¶ 8, 19, 24.

Add to the list of disputes whether Galloway had been taking the Carisoprodol at the prescribed intervals. Def.'s Resp. PSOF ¶ 7. Cabot, Galloway's orthopedic surgeon, had suspected that Galloway was drug-seeking before her death, and so Cabot eventually denied Galloway's request for even more pain medication for taking too much and not as prescribed. DSOF ¶ 29. If Galloway had

4

followed the instructions accompanying Karkalas' March 3 and April 6 prescriptions (one tablet to be taken four to six times per day), the pills from the first would have been consumed by April 11 and the second before the date of her death. *Id*. ¶¶ 15-16, 34-35.

## B. Procedural History

Galloway's estate and her parents filed suit in March 2011, asserting Georgia common-law wrongful death claims and alleging that Defendants had also violated Georgia's Racketeer Influenced and Corrupt Organizations (RICO) Act. R. 1, Compl. Euromedonline did not appear to defend the action, but the other Defendants moved to dismiss Plaintiffs' Amended Complaint. R. 35, 39, 61, 76, 81, Mots. Dismiss. This Court granted the motion only as to the RICO claims, holding that Plaintiffs had pled necessary facts to survive dismissal on claims that Defendants negligently prescribed and distributed medication to Galloway. R. 90-1, Order dated March 30, 2012 at 9-10. With discovery now completed, the Court considers whether these same claims survive a summary-judgment challenge.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable

inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only competent evidence of a type otherwise admissible at trial, *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Discussion

### A. Legal Standards

Under Georgia law, which the parties agree applies in this diversity action, there are three elements to establishing liability for medical malpractice: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." *Zwiren v. Thompson*, 578 S.E.2d 862, 864 (2003) (quotation omitted). Proximate cause "is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *T.J. Morris Co. v. Dykes*, 398 S.E.2d 403, 406 (1990). A plaintiff must prove that a defendant's negligence proximately caused

6

or contributed to his harm by a preponderance of the evidence. *Zwiren*, 578 S.E.2d at 864. "[I]t is axiomatic that questions regarding proximate cause are undeniably a jury question and may only be determined by the courts in plain and undisputed cases." *Ontario Sewing Mach. Co. v. Smith*, 572 S.E.2d 533, 536 (2002) (citation and internal quotation marks omitted). There exists no "universal formula" for understanding what constitutes proximate cause—"[it] is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent." *Atlanta Obstetrics & Gynecology Grp., P.A. v. Coleman*, 398 S.E.2d 16, 17 (1990).

Particularly in medical malpractice cases applying Georgia law, plaintiffs generally must present expert testimony "because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson." *Zwiren*, 578 S.E.2d at 865 (citations omitted). "Using the specialized knowledge and training of his field, the expert's role is to present to the jury a realistic assessment of the likelihood that the defendant's alleged negligence caused the plaintiff's injury." *Id.* (citation omitted). Likelihood in this context means "terms stronger than that of medical possibility" but not necessarily certainty; that is, the expert must articulate a "reasonable medical probability" that the professional negligence caused the harm in question. *Knight v. Roberts*, 730 S.E.2d 78, 84 (2012) (quotation omitted).

## B. Analysis

Certain facts are not in dispute, at least for purposes of the summary-judgment motion. First, Galloway had Carisoprodol in her system when she died. DSOF ¶ 24. Next, viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that the Carisoprodol was at least partly responsible for the multiple drug toxicity that killed Galloway. PSOF ¶ 6. Also, for the purposes of their motion, Defendants do not challenge that they owed a duty of care to Galloway, and that this duty was breached when they prescribed and provided her with Carisoprodol. R. 192, Defs.' Br.[3]

Defendants argue, however, that there is no possible way to establish at trial that Galloway's death was proximately caused by the pills that *they* specifically prescribed and shipped. *Id.* at 11-12. Although it is a very close call, the Court disagrees and concludes that there is a genuine issue of material fact on this issue.

### 1. Rootsaert

Before addressing the substance of that factual issue, the Court notes at the outset that summary judgment is appropriate for the claims against Kyle Rootsaert, because Plaintiffs have not articulated any basis for his individual liability. Rootsaert denies that he himself had any role in filling, dispensing, or shipping any prescription of Carisoprodol. R. 198, Rootsaert SOF ¶ 2. Indeed, Plaintiffs have offered no evidence to support their allegation that Rootsaert was personally involved in the prescription. After merely identifying Rootsaert as a citizen of Utah

---

[3]For the sake of efficiency, Karkalas and Upper Merion submitted a combined brief in support of the summary-judgment motion, which was adopted in full by the other Defendants. *See* R. 197, Roostaert's Br. at 8; R. 200, Byron's Br. at 2.

and the owner and operator of Rand Pharmacy in their pleadings, Plaintiffs produced nothing further in the discovery record. Am. Compl. Jurisdiction ¶ 4, Count 1 ¶ 1. Mere ownership of a business entity is not, by itself, a sufficient basis on which to find personal liability without a showing of an individual's direct involvement in the complained-of conduct; instead, a plaintiff must pierce the corporate veil. *Ishak v. Lanier Contractor's Supply, Inc.*, 561 S.E.2d 883, 885 (2002) (piercing the corporate veil is appropriate where the individual defendant's use of the business was a "mere alter ego" or "instrumentality for the transaction of [his] own affairs"). Because Plaintiffs do not make even the barest of efforts to do so, other than a vague and undeveloped allusion to the concept of a "pharmacist in charge," R. 205, Pls.' Resp. Rootsaert Br. at 2, Rootsaert is entitled to judgment on the claims raised against him individually.[4]

---

[4]Because he is removed from the case on other grounds, Rootsaert's motion to strike the report, and bar the testimony, of Plaintiffs' expert opining on his particular negligence, Rootsaert Br. at 2-6, is denied as moot. Rootsaert's application for sanctions against Plaintiffs' counsel, *id.* at 6-7, is also denied as moot as he has suffered no harm now that he has been granted judgment. *See* Fed. R. Civ. P. 37(c)(1). The Court warns Plaintiffs' counsel, however, that the conduct Rootsaert described (unrefuted in substance by counsel's response)—that is, counsel's drafting of the expert report himself and then emailing it to the expert for her signature without a genuine independent review *before* signing it, Rootsaert Br. at 3—is not acceptable practice. Although Federal Rule of Civil Procedure 26(a)(2)(B) "does not preclude counsel from providing assistance to experts . . . the report, which is intended to set forth the substance of the direct examination, should be written in a manner which reflects the testimony to be given by the witness." *Isom v. Howmedica, Inc.*, 00 C 5872, 2002 WL 1052030, at *1 (N.D. Ill. May 22, 2002) (quoting Advisory Committee Notes) (accepting expert witness as author where lawyer drafted language of report but only where witness "was sufficiently involved in the preparation and revision of the report").

## 2. Remaining Defendants

### a. Genuine Issue of Material Fact on Causation

At first blush, the facts of this case would seem to fit the tort doctrine known as alternative liability. First articulated in the seminal case of *Summers v. Tice*, 199 P.2d 1 (1948), this doctrine shifts, at the causation stage, the burden ordinarily placed on the plaintiff to prove each element of a tort claim. It applies to a very specific set of circumstances: where more than one party has been negligent, but it is impossible to determine which party actually caused the harm suffered. In that situation, each defendant remains jointly and severally liable unless he can establish that his conduct did *not* proximately cause the injury. *See, e.g.*, *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 754 (7th Cir. 2011) (doctrine invoked "when each of two wrongdoers could have caused the plaintiff's injury and it is unclear which did and each points at the other and says let me off because the other guy may have done it"). Given that Defendants find themselves in an analogous position, it is very likely that summary judgment would be out of the question if alternative liability governed this case. But it does not (nor do the parties suggest otherwise), as Georgia state courts apparently have not embraced the doctrine. *See Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1520 (11th Cir. 1988).

The practical result is that Plaintiffs' claims become much more difficult to prove. Without this burden-shifting doctrine, in order to prevail, Plaintiffs must establish proximate causation by a preponderance of the evidence for each of the

remaining Defendants—that Galloway consumed some of *each* of Defendants' pills as part of the lethal dosage (or dosages) that killed her.[5] At this stage, everything turns on whether there exists evidence, when viewed in the light most favorable to Plaintiffs, upon which a reasonable jury could make such an inference.

Defendants contend that there is not, arguing that one of only two possible factual scenarios could have occurred: Galloway either followed the four-to-six pills per day dosage instructions on the March and April prescriptions from Defendants, or she took the medications at an even faster rate—both leading to the conclusion that Defendants' pills would have been depleted some days before Galloway's death. Defs.' Br. at 12-15; Defs.' Reply Br. at 6. By process of elimination, although Defendants never say so explicitly, Galloway therefore *must* have died after consuming the Carisoprodol from one of her other sources, Drs. Cabot or Arain.

The Court disagrees, though it is a close question. Although Plaintiffs hardly present a compelling evidentiary record, the Court cannot rule out that a jury could reasonably reach a different interpretation of the facts—especially when viewed in the light most favorable to Plaintiffs. The jury could infer, from the sheer proportion of the pills represented by the bottles found in Galloway's apartment that were linked to Defendants (300 from the Karkalas prescription and 90 from the Byron

---

[5]An important assumption that both parties appear to make is that the lethal effect of Carisoprodol may solely be linked to the ingestion of a dangerous amount in a short period of time, in other words by overdosing. Nowhere in the discovery record is there any suggestion that the harm from Carisoprodol may be derived from more attenuated abuse. This is an important omission. If discovery had shown that Carisoprodol's toxicity can also be attributable to its gradual use and dependency developed over time, for example, Defendants' focus on whether their pills were ingested by Galloway close to her death would not be as dispositive on the question of causation as they believe. Plaintiffs do not raise this issue, however, nor does their expert report disclose any opinion on it.

compared to 60 from the two Cabot prescriptions, 19 of which remained), as well as from the proximity of the empty Karkalas bottles on the kitchen counter to Galloway's body, that she ingested some of Defendants' medication close in time to her death. Contrary to Defendants' assumption that Galloway could only have consumed all of their pills at a rapid and steady rate (either at or much faster than prescribed), the jury could infer from the presence of numerous and various types of prescription bottles in Galloway's apartment that she ingested the various medications, including Carisoprodol, irregularly and in different combinations (in effect taking the Carisoprodol at a rate slower than prescribed).

The point is not that this scenario is any more likely than the one Defendants suggest, only that it is also reasonable when the inferences are taken in Plaintiffs' favor. When and at what rate Galloway took the Carisoprodol is a crucial question of material fact that the parties contest. Defendants essentially ask the Court to adopt their interpretation (based on inferences favorable to them, the moving party) as the *only possible* conclusion. That the Court cannot do, for it is the jury that must make the necessary inferences. *See Smith*, 572 S.E.2d at 536. Whether the Plaintiffs can successfully persuade the jury at trial—when Plaintiffs bear the burden of proof and when there will be no light-most-favorable viewpoint—that Galloway took the relevant pills as part of the fatal dose(s) is another question.

### b. Plaintiffs' Expert

Plaintiffs have also put forth for the jury's consideration an expert, Dr. Jerrold Leikin, who is board certified in medical toxicology and devotes a significant

12

part of his practice to overdose cases. PSOF ¶ 1. Although Plaintiffs have met, at least nominally, their burden under Georgia law of furnishing expert testimony, *Zwiren*, 578 S.E.2d at 865[6], Leikin's opinion as developed in the record is hardly compelling.

In his Rule 26 Report, which can charitably be characterized as concise, Leikin concluded that Galloway's death was "a direct and proximate result of Dr. Rudy Byron's and Dr. Elias Karkalas' deviation from the standard of care in prescribing Carisoprodol" to her. R. 202-6, Am. Rule 26(a)(2) Report of Jerrold Leikin, M.D. ¶ 3. But this is a conclusory statement forwarding a legal opinion, unsubstantiated by any specific medical rationale. *See, e.g.*, *Heard v. City of Villa Rica*, 701 S.E.2d 915, 919(2010); *Pottinger v. Smith*, 667 S.E.2d 659, 661 n.3 (2008). Leikin's deposition testimony is similarly light on medical reasoning. Leikin testified that it was his opinion that the Carisoprodol in Galloway's system had "more likely" been prescribed by Karkalas than Cabot "because of the magnitude of the elevation and the prescription frequency interval." R. 202-1, 202-2, Leikin Dep. Tr. at 93. What Leikin appears to be stating is that he thinks Defendants likely caused Galloway's death because they prescribed so much more of the Carisoprodol

---

[6]The parties do not appear to contest that the requirement of a medical expert to testify on proximate causation is a substantive element of Georgia law, as distinct from an evidentiary question that is procedural. The distinction is important, of course, because under the *Erie* doctrine, a federal court sitting in diversity must apply state substantive law but relies on its own procedural rules. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *accord Musser v. Gentiva Health Servs.*, 356 F.3d 751, 755 (7th Cir. 2004). The parties' assumption might be well grounded, because the Seventh Circuit has held that a similar Illinois requirement is substantive in nature and thus must be enforced in federal court. *Wallace v. McGlothan*, 606 F.3d 410, 419 (7th Cir. 2010) (citing *Murrey v. United States*, 73 F.3d 1448, 1456 (7th Cir. 1996)) (noting that Illinois' requirement of expert testimony in certain medical malpractice cases is substantive).

13

she had access to than anyone else and directed her to take it more frequently. As discussed above, this is a plausible inference—but one that a *jury* reasonably makes (or could make) based on a common-sense understanding of the facts, not one that depends on any kind of specifically medical or scientific expertise, at least as articulated by Leikin at his deposition. *See Cowart v. Widener*, 697 S.E.2d 779, 791 (2010) (distinguishing between expert's role in creating a material issue as to causation and lay jury's responsibility to resolve that issue by inferring causal link).

Where Leikin does present medical expertise—though narrowly—is his testimony concerning the levels of Carisoprodol found in Galloway and the implications of those figures. *See* Leikin Dep. Tr. at 61-62. This information is relevant, as the larger the quantity of Carisoprodol required to have harmed Galloway, the greater the inference becomes that she consumed some of Defendants' pills (remember that only 11 of the 30 pills in Cabot's May 13 prescription bottle were missing). Yet Leikin was remarkably un-concrete in his opinions, stating that he could not give a precise number or range on the amount of Carisoprodol Galloway had been taking. *Id.* at 66-67. The most detail he offered was his belief that the levels of the substance found in Galloway's autopsy was "more compatible with her taking it multiple times a day than once a day" *Id.* at 82. That opinion can hardly be characterized as the basis for a strong inference in support of Plaintiffs' case, but it represents a medical opinion nonetheless that the jury should consider in determining (on its own terms as well as in light of all the other evidence)

whether Leikin offers a "realistic assessment" of proximate causation. *See Zwiren*, 578 S.E.2d at 865.

### c. Cases Cited by Defendants

Finally, Defendants incorrectly rely on certain case law in support of their argument that Plaintiffs' case is irredeemably flawed. In *Grantham v. Amin*, a wrongful death action alleging a physician's negligence in prescribing certain medication, the plaintiffs' expert testified that the drug in question "could have been a significant contributing cause" of death, but "this determination can only [have been] verified [by] an autopsy." 471 S.E.2d 525, 526 (1996). Because the autopsy results were the only source of confirmation, by the expert's own concession, establishing causation without them was "an insurmountable hurdle" for the *Grantham* plaintiffs. *Id.* at 527. In Galloway's case, by contrast, a post-mortem examination was completed, establishing Carisoprodol as a cause of death (at least when viewed in Plaintiffs' favor), so the only issue for deciding this motion, as discussed above, is whether the jury can reasonably identify Defendants as the supplier of the fatal Carisoprodol.

Two other cases cited by Defendants are similarly distinguishable. In *Berry v. Hamilton*, the absence of any eyewitnesses and inconclusive physical exam meant that the decedent could have been killed in any number of ways arising from a late-night motorcycle accident. 541 S.E.2d 428, 430 (2000). In *Hoffman v. AC&S, Inc.*, plaintiffs could not establish through an expert or otherwise that they had actually used defendants' asbestos product in the period of alleged harm. 548 S.E.2d 379,

383 (2001). Again, there is no uncertainty about Galloway's use of Carisoprodol, and in light of the prescriptions and empty bottles, there is little reason to doubt that she—at some time—ingested Carisoprodol prescribed by Defendants. The only question is whether a jury reasonably could find that the fatal pills were the ones supplied by Defendants. And as discussed above, the jury reasonably could so find.

*Anthony v. Chambless* is also inapposite because the expert testimony in that case was deemed mere conjecture, musing about potentially life-saving treatment that was not provided but was in any event "unavailable or factually impossible." 500 S.E.2d 402, 405 (1998). Leikin's testimony about Carisoprodol's toxicity levels, although not framed in the most certain terms, was not based on mere conjecture, but rather was based on the factual basis of how much medication Galloway ingested.

To summarize, although Plaintiffs and their expert have not developed a resounding record in support of their burden to prove causation (which is considerable without the tool of the alternative-liability doctrine), neither have Defendants established that there is no genuine issue of material fact. Because a reasonable jury could still make a number of reasonable inferences about which Carisoprodol Galloway ingested before her death, summary judgment is unwarranted.

## IV. Conclusion

For the reasons discussed, Defendants' motion [R. 192] is denied, except as to Defendant Kyle Rootsaert, whose separate motion to enter judgment for him [R. 197] is granted. Rootaert's motion [also in R. 197] to strike and bar certain expert evidence and for sanctions is denied as moot.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: October 27, 2014